**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**UNITED MARINE DIVISION, LOCAL
333, NATIONAL MARITIME UN-
ION, AFL–CIO, Respondent.**

Nos. 43, 44, Dockets 33220, 33221.

United States Court of Appeals
Second Circuit.

Argued Sept. 19, 1969.

Decided Oct. 24, 1969.

Michael F. Rosenblum, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William F. Wachter, Atty., N.L.R.B., of counsel), for petitioner.

Richard L. Newman, New York City (Steven L. Werner, New York City, of counsel), for respondent.

Before MOORE, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order against United Marine Division, Local 333, National Maritime Union, AFL-CIO, 166 NLRB No. 9. The Board's order was based on a finding that Local 333 violated Section 8(b) (1) (A) and Section 8(b) (2) of the National Labor Relations Act, 29 U.S.C. § 158(b) (1) (A) and (b) (2) (1964),[1] by causing Tracy Towing, Inc. to discharge its employee John Obermeier.[2] The Union contests that part of the order which requires it, jointly and severally with the Company, to compensate employee Obermeier for any loss of earnings he suffered as a result of his unlawful discharge.

The essential facts are not in dispute. John Obermeier was employed by the Company as a first assistant engineer aboard one of its tugboats. His employment was covered by a collective bargaining agreement between the Union and the Company. The agreement contained a union-security clause, requiring membership in the Union as a condition of continued employment. Obermeier was a member of the Union.

At a regular monthly meeting of the Union, Obermeier, who was participating in a discussion of an increase in Union dues, charged that the Union's president "was working for the boat owners." By Obermeier's own later admission to the grievance committee these words were intended to imply that the president was taking graft. Obermeier persistently refused to retract his charge despite the president's warning that he was risking his job.

The Union's president filed charges against Obermeier, and, in accordance with internal Union procedures, the Union grievance committee held a hearing of which a stenographic record was made. During the course of the hearing it was brought out that Obermeier's statements at the Union meeting were predicated upon his long-standing discontent with the conduct of the president. Specifically, Obermeier criticized the role of the president in the Union's decision several years before to comply with the Company's request to reduce the number of employees on the boats. Simply stated, Obermeier felt that the Union president in that matter had acted in the interest of the Company and contrary to the interest of the employees. In response to a question as to whether he intended to imply that the president "was getting paid by the boat owners for doing something that was detrimental to the membership of the union," Obermeier said: "I do not know, cannot prove, cannot say definitely that

---

1. "It shall be an unfair labor practice for a labor organization or its agents—

   (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *

   (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

2. The Board also found that the Company violated Section 8(a) (1) and (3) of the Act, 29 U.S.C. § 158(a) (1) and (3) (1964), by discharging Obermeier. The petitioner's brief states that the Company has complied with that part of the order which is directed against it.

he was getting paid, no." Obermeier, however, admitted that he was aware at the time of making his statement that it carried an implication of graft-taking. While adhering to his opinion of the president, Obermeier stated that he regretted his remarks and that "there was no intention or malice behind the thing as far as [the president's] reputation or employment was concerned."[3]

Obermeier was suspended from membership in the Union for a period of six months and deprived of his union privileges for one year. The Union president advised the Company of the Union's action against Obermeier and asked the Company "to relieve him of his duties immediately." Upon reporting to work, Obermeier was told by a Company official that, since he was no longer a member in good standing of the Union, he was discharged from the Company's employ.

Obermeier thereupon filed charges with the Board and a complaint was issued against the Company and the Union alleging violations of Section 8(a) (1) and (3) and Section 8(b) (1) (A) and (b) (2) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1) and (3), 158(b) (1) (A) and (b) (2). The trial examiner found that the Union and the Company had engaged in and were engaging in the unfair labor practices alleged in the complaint. As of the date of the trial examiner's decision, Obermeier had received no unconditional offer of reinstatement from the Company. Nor had the Union advised the Company that it no longer had any objection to his employment.

The Board affirmed its trial examiner and ordered the Union and the Company jointly and severally to compensate Obermeier for any loss of earnings he suffered as a result of the discrimination practiced against him.

The Union does not contest the Board's conclusion that it violated Sec-

tion 8(b) (1) (A) and Section 8(b) (2) of the Act. Nor could it. The Union sought and obtained Obermeier's discharge because of his non-membership. His loss of membership was the result of his suspension which came about because of his remarks attacking the Union president. The Union's action violated the explicit statutory prohibition against causing or attempting to cause an employer to discriminate against an employee "with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." 29 U.S. C. § 158(b) (2) (1964). Radio Officers' Union, etc. v. NLRB, 347 U.S. 17, 40–42, 74 S.Ct. 323, 98 L.Ed. 455 (1954); NLRB v. Local 50, American Bakery & Confectionery Workers Union, 339 F.2d 324, 326–328 (2d Cir. 1964), cert. denied, 382 U.S. 827, 86 S.Ct. 62, 15 L.Ed. 2d 72 (1965).

The Union, however, contests that part of the order which holds it jointly and severally liable with the Company for Obermeier's back pay. It contends that the Company's failure to reinstate Obermeier resulted solely from the Company's independently formulated conclusion that Obermeier's statements, reflecting discredit on the Company for bribing a union official, rendered him unfit for reemployment. The Union argues that it was actually charged with two violations of the Act: (1) causing or attempting to cause the Company to discharge Obermeier for a statutorily-prohibited reason; and (2) thereafter causing or attempting to cause the Company to refuse to reinstate Obermeier. The Union asserts that there was no proof that it committed the second violation. It relies for exoneration on the Company's offer to prove that its failure to reinstate Obermeier was due "solely" to Obermeier's refusal to "disavow the

---

3. Upon an examination of Obermeier's testimony, the Board found nothing to indicate that his remarks at the grievance committee hearing were deliberately or maliciously false.

imputation of wrongdoing on the part of the company."[4] This offer of proof was rejected by the trial examiner but was accepted and assumed as correct by the Board on the issue of Obermeier's suitability for reemployment.[5] The Union asserts that the Board's acceptance of this evidence necessarily leads to the conclusion that the Union did not cause or attempt to cause the Company to fail or refuse to reinstate Obermeier and that it was therefore improper to subject the Union to the back pay order. We do not agree.

The back pay order directed against the Union was based upon the Union's action in causing the Company to discharge Obermeier because of his suspension from Union membership. Upon such a finding the Board is authorized by statute to require back pay "of the employer or labor orgainization, as the case may be, responsible for the discrimination suffered" by the employee. 29 U.S.C. § 160(c) (1964). See Radio Officers' Union, etc. v. NLRB, *supra*, 347 U.S. at 54, 74 S.Ct. 323. In applying this remedy, the Board is directed to act in such a manner "as will effectuate the policies" of the Act. 29 U.S.C. § 160(c) (1964). We believe that assessing the back pay remedy against the Union in this case is consistent with this directive.

■■ The Board's broad remedial power to order compensation for lost pay is intended to be exercised not only to remedy the consequences of an unfair labor practice, but also in aid of the Board's authority to deter unfair labor practices. See Consolidated Edison, etc. v. NLRB, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938); NLRB v.

Mastro Plastics Corp., 354 F.2d 170, 175 (2d Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). This is not to suggest that the back pay order may be used in a purely punitive manner. The policy does, however, authorize the Board to go beyond a consideration of which party was primarily responsible for the employee's continuing economic loss to a determination of which party caused the employee to be placed in the position where he would be subject to such loss. The Board may allocate causal responsibility on this issue and assess the back pay accordingly.

■■ The Union's burden of limiting its liability for Obermeier's continuing economic loss was not onerous. At any time, the Union could have informed the Company that it had no objection to his reinstatement. This would have been effective to stop the running of the back wage claim against the Union even if the Company chose not to reinstate Obermeier. See Pinkerton's National Detective Agency, Inc., 90 NLRB 205, 213 (1950), aff'd sub nom., NLRB v. Pinkerton's National Detective Agency, Inc., 202 F.2d 230 (9th Cir. 1953). However, the Union never so informed the Company. Rather, it consistently adhered to the position that he should be reinstated only if he recanted his remarks. Having prompted Obermeier's discharge because of his criticism of the Union president and having persisted in its insistence that he must withdraw his comments as a condition of renewed membership and employment, the Union cannot shift to the Company the entire responsibility for Obermeier's loss of earnings.

4. The Company's second affirmative defense to the Board's complaint included the following statement:

"By reason of the making of said unfounded defamatory charges of criminal conduct by Obermeier and his refusal to disavow such charges so that publicity of such disavowal could be given to the many people before whom such charges were made, Respondent Tracy is unwilling to reinstate Obermeier solely for that reason, and Respondent Tracy alleges that it would not effectuate the purposes of the Act for the Board to order reinstatement in those circumstances."

5. The Board found, however, that this evidence did not justify the Company's failure to reinstate Obermeier.

Holding the Union jointly and severally liable with the Company for Obermeier's back pay is entirely consistent with the policies of the Act. See Radio Officers' Union, etc. v. NLRB, *supra* 347 U.S., at 40–42, 74 S.Ct. 323. To allow the Union to escape liability for Obermeier's back wages would be to provide an unjustifiable exception to a union's liability under Section 8(b) (2) of the Act.

Order enforced.